Louis Persiani

*v.*

SWCC, *and* Ashland Mining Co.

(No. 14241)

Ernest Jackson, Jr.

*v.*

SWCC, *and* United Pocahontas Coal Co.

(No. 14202)

Alexander H. Harmon

*v.*

SWCC, *and* U. S. Steel Corp.

(No. 14197)

Decided November 14, 1978.

*Frederick K. Muth* for appellants in all three cases.

*Richardson, Kemper, Hancock & Davis, Charles W. Davis* for Ashland Mining Co.

*Kwass, Stone, McGhee & Feuchtenberger, J. W. Feuchtenberger* for United Pocahontas Coal Co.

*Love, Wise, Robinson & Woodroe, George W. S. Grove, Jr.,* for U. S. Steel Corp.

NEELY, JUSTICE:

These three cases were consolidated for hearing because they all present the same troublesome question concerning the proper application of the liberality rule in claims for occupational pneumoconiosis. All three claimants suffer diagnosable conditions of occupational pneumoconiosis, although none demonstrated any measurable impairment on standard tests administered by the employers' physicians and submitted to the Occupational Pneumoconiosis Board. All claimants did, however, demonstrate a measurable impairment on blood gas studies performed by their own physicians who were connected with a small clinic in Virginia which the Occupational Pneumoconiosis Board declined to believe because the Board thought the clinic unreliable. We apply the liberality rule and reverse.

I

It will be remembered that under *W.Va. Code*, 23-4-15b [1971] the Commissioner makes a non-medical finding of exposure to the hazards of occupational pneumoconiosis and then refers the claimant to the Occupational Pneumoconiosis Board which consists of five qualified physicians for the purpose of evaluating the claimnant's disability, *W.Va. Code*, 23-4-8b [1971]. Once the Occupational Pneumoconiosis Board has examined the claimant and received all evidence which either the claimant or employer wishes to submit, the Board renders a medical opinion to the Commissioner concerning claimant's disability. *W.Va. Code*, 23-4-8c [1978]. While under *W.Va. Code*, 23-4-6 [1976] the Commissioner is ultimately responsible for making the award, we infer from the records before us (as well as prior cases) that absent compelling reasons to believe the Board's recommendation erroneous, the Commissioner enters an order in accord with the Board's opinion.

What happens, however, when the claimant introduces expert testimony on disability to the Occupational Pneumoconiosis Board who, as experts themselves, disbelieve the claimant's evidence and find the evidence of the employer's examining experts more credible? In this instance we are caught between two conflicting legal rules. The first is that the findings of administrative agencies are entitled to great weight because of the agencies' expertise in the areas of their responsibility,[1] and the second is the liberality rule in Workmen's Compensation based upon the rationale that the Workmen's Compensation statutes are remedial and should be liberally construed to effect their beneficient purposes.[2] It would appear that we have addressed this issue numerous times in the last ten years[3] and have generally held that the Commissioner and the Workmen's Compensation Appeal Board must view the evidence in the light most favorable to claimant whenever the evidence is sufficiently in conflict that reasonable men could differ concerning whether claimant has proven his case.[4] In previous cases addressing this subject but not involving pneumoconiosis the medical examinations before us had a large element of subjective evaluation to them; they concerned orthopedic disabilities, *Lilly v. State Workmen's Comp. Comm'r.,* ____ W.Va. ____, 225 S.F.2d 214 (1976), psychiatric impairment, *Sisk v. State Workmen's Comp. Comm'r.,* 153 W.Va. 461, 170 S.E.2d 20 (1969), and total disability to engage in any occupation for which

[1] *See generally Federal Trade Comm. v. Cement Institute,* 333 U.S. 683 (1948); *Securities & Exchange Comm. v. Chenery,* 332 U.S. 194 (1947).

[2] *Dunlap v. State Workmen's Comp. Comm'r.,* ____ W. Va. ____, 232 S.E.2d 343 (1977); *Johnson v. State Workmen's Comp. Comm'r.,* 155 W. Va. 624, 186 S.E.2d 771 (1972).

[3] *See, e.g., Sowder v. State Workmen's Comp. Comm'r.,* 155 W. Va. 889, 189 S.E.2d 674 (1972); *Whitt v. State Workmen's Comp. Comm'r.,* 153 W. Va. 688, 172 S.E.2d 375 (1970); *Pennington v. State Workmen's Comp. Comm'r.,* 154 W. Va. 378, 175 S.E.2d 440 (1970); *Ramsey v. State Workmen's Comp. Comm'r.,* 153 W. Va. 849, 173 S.E.2d 88 (1970).

[4] *See Sowder, supra; Pennington, supra; Ramey v. State Workmen's Comp. Comm'r.,* 150 W. Va. 402, 146 S.E.2d 579 (1966).

the claimant was suited by training or experience, *Posey v. State Workmen's Comp. Comm'r.*, ___ W. Va. ___, 201 S.E.2d 102 (1973). The unique aspect of the cases now before us is that the entire question of disability turns upon simple blood gas studies which would appear to leave remarkably little room for subjective interpretation. In prior cases we have implied that while the Commissioner and the Workmen's Compensation Appeal Board need not accept the highest level of disability recommended by any of the claimants' experts, nonetheless, they are not entitled to accept the lowest figure to which the employers' physicians have testified in the face of competent evidence to the contrary.

Apparently in determining the degree of impairment from which a claimant exposed to the hazards of pneumoconiosis is suffering there are at least four tests which a competent physician performs. The first is an X-ray to determine whether the pneumoconiosis is observable as nodules impairing the functional capacity of the alveoli of the lungs. While the X-ray examination is capable of demonstrating the existence of pneumoconiosis, it is neither dispositive of the issue, *W.Va. Code*, 23-4-1 [1976], nor is it particularly helpful in determining the degree to which the claimant is impaired as a result of the condition. In order to help determine the degree of impairment a clinical examination is given as a second test to determine whether the pneumoconiosis has affected any organs, other than the lungs, such as the heart. A third test called a ventilation study determines claimant's ability to inhale and exhaust air, and finally a fourth test measures the level of oxygen and carbon dioxide in the arterial system by taking blood extracted from an artery, causing the gas dissolved in the blood to dissociate, and measuring the partial pressure of oxygen, known as $PO_2$ and the partial pressure of carbon dioxide, known as $PCO_2$ in millimeters of mercury.

The purpose of the lungs is to tramsmit oxygen into the blood stream and to exhaust carbon dioxide from the blood stream. This is accomplished through little sacs in the lungs known as alveoli which provide a large surface

area exposed to the blood. The minute particles of dust of which the occupational pneumoconiosis statute speaks have the effect of clogging or impairing the alveoli and reducing the lungs' capacity both to diffuse oxygen into the blood stream and to exhaust carbon dioxide from the blood stream. As the blood gas tests are always performed on blood extracted from an artery (as opposed to a vein) the higher the reading for oxygen the better the alveoli are functioning; similarly the lower the level of carbon dioxide the better the alveoli are functioning because low carbon dioxide on the artery side of the heart indicates successful exhaustion of that chemical in the same way that high oxygen indicates successful diffusion into the blood stream.

It is possible for a claimant to demonstrate perfectly normal performance on three of the four tests described above, and yet demonstrate a measurable impairment on the fourth. On the other hand a claimant may be obviously impaired on all four tests, or may demonstrate a pneumoconiosis condition without any measurable impairment of his bodily functions. In the cases before us the claimants do not allege a significant measured impairment on any test except the blood gas study. It should be apparent from the discussion above that the least subjective test of the four tests described is the blood gas study, which would appear to involve the application of simple chemical analysis capable of impartial execution by technicians in any well-managed clinical pathology laboratory.

Claimants in the cases before us submitted expert testimony from the Virginia Inter-Mountain Pathologist Laboratory in Abingdon, Virginia, demonstrating a measurable disability based upon blood gas studies. At the request of their respective employers, two of the claimants were referred to the Charleston Area Medical Center and one was referred to the Bluefield Sanitarium where the same tests were performed, and in each case the examining doctors reported to the Occupational Pneumoconiosis Board that the measured blood gas was within the normal range. When the Occupational Pneu-

moconiosis Board recommended no awards the claimants protested, cross-examined members of the Board, and elicited testimony from the members which may be reasonably read to imply that the Board did not trust or believe the Virginia Inter-Mountain Pathologist Laboratory in Abingdon, Virginia and did believe the Charleston Area Medical Center and the Bluefield Sanitarium. The Board indicated that they were familiar with the methodology employed by the employers' examiners and found it competent, while they found the work at the clinic in Abingdon less than reliable.

These cases are particularly vexing because acceptable medical methodology is that the result on any of a series of blood gas studies given on different days which demonstrates the lowest measured impairment will be is the most reliable for diagnostic purposes because these tests are far more susceptible to intentional or unintentional errors which would indicate impairment than they are to errors indicating no impairment. If, for example, the claimant is depressed and therefore breathing in a shallow manner, or hypoventilating, his intake and exhaustion of air will be reduced and, accordingly, the level of gas in his blood will be reduced. In the same way, if he is suffering from a cold or some other unrelated medical problem, his intake of air and attendant blood gas diffusion may be impaired so he will do more poorly on the test than his normal capacity should permit; on the other hand, the only way in which the claimant could appear to do better on the tests than his natural capacity would be to breathe very deeply or hyperventilate for a long period before taking the examination. As *normal* breathing before the test is a condition precedent to an accurate reading on these examinations, it ineluctably follows that patient cooperation is a necessary ingredient to a successful test. It may be assumed that any workmen's compensation claimant would be sufficiently knowledgeable not deliberately to breathe deeply for an hour before taking the examination, and that certainly any sympathetic administrator of the test would instruct the claimant in this regard

prior to taking the measurements. On the other hand, it may be reasonably inferred that many claimants will know that these tests demonstrate a greater degree of impairment when the claimant has hypoventilated for a time before the test. For these reasons, therefore, the Board indicated in the record that the highest reading demonstrating the least impairment is probably, from a medical point of view, the most reliable indication of the claimants' actual capacity.

We are, quite frankly, in a quandary because on the one side we have a high regard for the Occupational Pneumoconiosis Board's professional competence in evaluating expert testimony, yet on the other side we have a rule of law, namely the liberality rule, which mandates that reputable evidence favorable to the claimant be considered and the claimant treated as generously as any reasonable view of the evidence would justify. In this regard the Occupational Pneumoconiosis Board, the Commissioner, and the Workmen's Compensation Appeal Board as finders of fact are in a different position from either a jury or a trial chancellor; they are not quite entitled to disbelieve evidence based exclusively upon their own subjective evaluation of the credibility of the witnesses. Although the Occupational Pneumoconiosis Board fairly implied that the Virginia Inter-Mountain Pathologist Laboratory was a less than reliable clinic, there was no evidence whatsoever to support the Board's inference in this regard. We find an error of law in failing to accord weight to expert testimony absent evidence that such testimony is not rendered with integrity.

## II

All tests are performed by men and women who are subject to human error, philosophical predisposition, and even, occasionally, unimaginative cupidity. While the people administering these tests, evaluating the tests, and entering orders based upon the tests perform those routine functions scores of times every month, the claimant is possessed of only one set of lungs and one

limited life expectancy. What if the Charleston Area Medical Center were wrong because it hired an inexperienced technician who performed his first test on a particular claimant and misread a crucial result? These three claimants had no notice that only the Charleston Area Medical Center's and the Bluefield Sanitarium's examinations would be believed by the Occupational Pneumoconiosis Board, nor were the claimants aware that testimony of the Inter-Mountain Pathologist Laboratory in Abingdon, Virginia would not be accorded as much weight as local West Virginia laboratories. If indeed the employers or the Occupational Pneumoconiosis Board were of the opinion that a particular laboratory were engaged in consistent mendacity for the purpose of generating business or effecting a result consonant with the philosophical disposition of its staff, then the burden would be upon the employer or at least the Occupational Pneumoconiosis Board to introduce credible evidence supporting that proposition or to solve the problem by general rule of which everyone would have advance notice. If the Occupational Pneumoconiosis Board, Commissioner, or Workmen's Compensation Appeal Board are concerned with the interrelationship between the liberality rule and the cupidity of qualified experts, it is for them to design procedures consistent with the statutory scheme to minimize the prejudicial effect which may exist in this regard.

## III

Probably the vexatious question of unreliable or deliberately misleading expert testimony can be handled adequately only by striking a balance between an extreme naivete predicated upon formal rules of evidence and an abject cyncicism predicated upon everyone's knowledge of the nature of man. There is unfortunately, no mechanical rule which will determine its own application in every case; there must be a judgment call every time. In these cases we find that according peculiar weight to a particular expert without prior notice or formal rules in that regard was clearly wrong. Accordingly, the judgment of the Workmen's Compensation Appeal Board is

reversed and the case is remanded to the Commissioner with directions to review the medical evidence in this case with due regard to the liberality rule as in any other case coming before him and to enter an appropriate order.

*Reversed and remanded.*