320 S.E.2d 119

Cue D. JAVINS

v.

WORKERS' COMPENSATION COM-
MISSIONER and Armco, Inc.

Cleophas H. HILL

v.

WORKERS' COMPENSATION COM-
MISSIONER and Westmoreland
Coal Co.

Ronnie E. BRITTON

v.

WORKERS' COMPENSATION
COMMISSIONER and
Eastern Associates.

Carl E. KEENEY

v.

WORKERS' COMPENSATION
COMMISSIONER and Big
Mountain Coals, Inc.

Charles T. LEWIS

v.

WORKERS' COMPENSATION COM-
MISSIONER and Eastern
Associated Coal.

David E.H. LAY

v.

WORKERS' COMPENSATION
COMMISSIONER and
Eastern Assoc., Inc.

Norman J. BALDWIN

v.

WORKERS' COMPENSATION COM-
MISSIONER and Westmoreland
Coal Co.

Earnest R. BIRCHFIELD

v.

WORKERS' COMPENSATION COM-
MISSIONER and Western
Assoc. Coal Co.

James FRAZIER

v.

WORKERS' COMPENSATION COM-
MISSIONER and Eastern
Assoc. Coal Co.

Albert L. McCARTY

v.

WORKERS' COMPENSATION COM-
MISSIONER and Armco, Inc.

Dennis RACER

v.

WORKERS' COMPENSATION COM-
MISSIONER and Armco, Inc.

William D. BRYANT

v.

WORKERS' COMPENSATION
COMMISSIONER and Eagle
Coal & Dock Co.

James E. ROBERTS

v.

WORKERS' COMPENSATION COM-
MISSIONER and Ottaway
Mining Corp.

Sidney BALL, Jr.

v.

WORKERS' COMPENSATION
COMMISSIONER and U.S.
Steel Corporation.

Othar BALL

v.

WORKERS' COMPENSATION
COMMISSIONER and Omar
Mining Company.

Gene A. BOWEN

v.

WORKERS' COMPENSATION
COMMISSIONER and Allied
Chemical Corporation.

Roy L. HENDRICKS

v.

WORKERS' COMPENSATION COM-
MISSIONER and Buffalo
Mining Company.

Johnny L. O'NEAL

v.

WORKERS' COMPENSATION COM-
MISSIONER and Imperial
Colliery Company.

Leland ESTEP

v.

WORKERS' COMPENSATION
COMMISSIONER and Hobert
Mining & Const. Co.

Ronald BROWNING

v.

WORKERS' COMPENSATION COM-
MISSIONER and Amherst
Coal Company.

Van B. CURRY

v.

WORKERS' COMPENSATION
COMMISSIONER and Island
Creek Coal Company.

John HUNT

v.

WORKERS' COMPENSATION COM-
MISSIONER and National Coal
Mining Company.

John P. SIZEMORE

v.

WORKERS' COMPENSATION COM-
MISSIONER and Amherst
Coal Company.

John JUDE

v.

WORKERS' COMPENSATION COM-
MISSIONER and Eastern
Associated Coal Corporation.

Nos. 16156 through 16178 and 16185.

Supreme Court of Appeals of
West Virginia.

June 27, 1984.

Dissenting Opinion July 20, 1984.

Timothy G. Leach, UMWA, Charleston, for appellants.

George D. Blizzard, II, Shaffer & Shaffer, Madison, for appellees.

McGRAW, Justice:

This consolidated appeal involves twenty-four separate occupational pneumoconiosis claims originally submitted to the Workers' Compensation Commissioner for disability awards. The claimants now appeal from orders of the Workers' Compensation Appeal Board, presenting two issues for this Court. First, whether the Workers' Compensation Appeal Board failed to properly evaluate the medical evidence under the correct legal standards in its disability determinations. Second, whether the Workers' Compensation Appeal Board erred by splitting the difference between initial findings or awards and subsequent findings or awards. Finally, whether the claimants are liable for benefits received pending final disposition of protests when their initial awards were subsequently reduced. Because we are remanding each of these claims to the Commissioner, the issue of overpayment need not be addressed. In order to give some perspective to our discussion of the legal issues presented, we will first describe the status of each claimant.

## I.

In all twenty-four of these cases, there exists a similar pattern of events. After the Commissioner's initial nonmedical ruling in each claim that the claimant met the statutory exposure criteria, the Occupational Pneumoconiosis Board submitted findings and recommendations based upon its own examinations and consideration of other medical evidence to the Commissioner. The Commissioner then made an award in accordance with these findings and recommendations. A protest to this award was subsequently made, usually by the employer. Following these protests, additional test results were submitted for consideration. Faced with conflicting medical evidence in each case, usually in the form of either ventilatory studies or blood gas studies, the Occupational Pneumoconiosis Board favored evidence in each case which indicated the lowest degree of pulmonary impairment under the theory that due to the irreversible and progressive nature of the disease, such evidence is a more reliable indicator of the claimant's maximum level of pulmonary function. Consequently, evidence indicating a higher degree of impairment was attributed by the Board to factors other than occupational pneumoconiosis.

In accordance with the Board's second set of recommendations, the Commissioner then entered a new order either modifying or affirming her initial award.[1] Each claimant subsequently appealed. On December 13, 1983, the Workers' Compensation Appeal Board issued separate but remarkably similar orders in each of these claims. In each case, the Appeal Board apparently calculated the claimant's award by splitting the difference between the Commissioner's initial award and subsequent reduced award, or between the Board's interpretation of test results which

---

1. In a small number of these cases the Commissioner made only one order of award, after and

in accordance with the Board's second set of recommendations.

indicated a high degree of impairment and results indicating a low degree of impairment.

Benefits were paid to each claimant based upon the initial award in each case, and continued during the protest period. The Commissioner's second order and the Appeal Board decisions have resulted in many of these claimants being deemed overpaid. The Commissioner is currently seeking reimbursement from these claimants under West Virginia Code § 23–4–1d (1981 Replacement Vol.).

Cue D. Javins filed an application for occupational pneumoconiosis compensation on April 8, 1980. The claimant had been continuously employed by Armco, Inc. at Montcoal, West Virginia for almost sixteen years. Prior to that he had been periodically employed by the same company at various locations in the state since 1950. Resting ear oxymetry tests were performed in September 1981. Based upon these tests, the Occupational Pneumoconiosis Board recommended and the Commissioner granted a 10% award. Following his employer's protest, new tests were performed which indicated normal pulmonary function. The Occupational Pneumoconiosis Board then changed its opinion, stating that the claimant had pneumoconiosis with no measurable pulmonary impairment. Therefore, the Commissioner set aside the prior 10% award and granted the claimant a 5% permanent partial disability award.[2] Whereupon, the claimant appealed and the Appeal Board reversed the Commissioner's order and awarded 7%.

C. Harvey Hill had previously been granted a 5% award. In March 1980, he filed a new application. At the time the application was filed, the claimant had been employed by the Hampton Division of Westmoreland Coal Company for over twenty years. The Occupational Pneumoconiosis Board found that ear oxymetry tests indicated a 10% disability. Therefore, in November 1981, the Commissioner ordered that the claimant be granted an additional 5% award above that already awarded. Following an employer protest, new ear oxymetry results were admitted into evidence which were within normal limits. In addition, two sets of blood gas studies were admitted, one offered by the claimant and one by the employer. Members of the Board testified that based upon these new test results, their recommendation was that no additional award beyond the original 5% disability in the previous claim be granted. Accordingly, the Commissioner set aside the November 1981 award and denied any award on this claim. Following the claimant's appeal, the Appeal Board reversed and ordered that an additional 2% disability be entered.

Ronnie E. Britton worked in Bald Knob, West Virginia for Eastern Associated Coal Corporation from May 1969 through March 1981. Prior to that he had been periodically employed by the other colliery in the state since 1967. The claimant filed a pneumoconiosis disability claim on May 5, 1981. Based upon pulmonary function studies performed at the Charleston Area Medical Center, the Occupational Pneumoconiosis Board found that the claimant had pneumoconiosis with a 25% impairment. Therefore, the Commissioner granted a 25% award. The employer protested, and the claimant was retested at the Charleston Area Medical Center. The Board found that the new results indicated only a 20% impairment. The Commissioner then set aside her previous order and granted a new award based upon 20% disability. On appeal, the Appeal Board reversed the Commissioner and awarded 22% permanent disability.

Carl E. Keeney was employed by Big Mountain Coals, Inc. from October 28, 1970, and was still working at the time his application for disability was filed on February 4, 1980. Prior to that date, he had worked for two other companies since 1960, one in West Virginia and the other in Texas. Based upon its own examination and tests, and blood gas studies performed at

---

**2.** West Virginia Code § 23–4–6a (1981 Replacement Vol.) provides that where there is evidence of occupational pneumoconiosis, but the impairment is not measurable, there should still be an award based upon 5% disability.

the Appalachian Pulmonary Laboratory in Beckley offered by the claimant, the Occupational Pneumoconiosis Board made a finding that the claimant had pneumoconiosis with a 15% impairment. At a protest hearing conducted on July 28, 1982, the employer offered results of blood gas studies obtained at the Charleston Area Medical Center. At this hearing, the claimant offered additional blood gas studies performed at the Appalachian Pulmonary Laboratory. The Board indicated that the studies offered by the employer showed that gas exchange was within normal limits and found that the claimant had pneumoconiosis, but with no impairment. The Commissioner then set aside the prior 15% award, and granted a 5% award for pneumoconiosis without impairment. On appeal, the Appeal Board reversed, and ordered a 9% award.

Charles T. Lewis has been retired since March 1977. In 1976, he was examined by the Occupational Pneumoconiosis Board and was found to have pneumoconiosis with a 20% impairment of pulmonary function. Following an employer protest, this evaluation was changed to 15% impairment, and the Commissioner granted a 15% award. In late 1979, Mr. Lewis petitioned to reopen his claim. In support of this petition, he submitted test results indicating a progression in the disease. The Occupational Pneumoconiosis Board reviewed these findings, as well as tests performed at their request at the Charleston Area Medical Center. The Board found 20% impairment due to pneumoconiosis, or 5% over and above the extent of impairment ultimately found in 1976. Following an employer's protest, repeat blood gas studies were performed. On the basis of the most recent test, the Board changed their recommendation to a finding that the claimant was fully compensated by the 15% award in 1976. Therefore, the Commissioner denied any further award. On appeal, the Appeal Board reversed the Commissioner's final order and granted a 2% increase.

David E.H. Lay was employed by Eastern Associated Coal Corporation in April 1952, and was still working at the time he filed an application for pneumoconiosis disability benefits on November 11, 1979. The Occupational Pneumoconiosis Board, considering its own pulmonary function studies and those submitted by the claimant's physician, found that the claimant had occupational pneumoconiosis with 20% impairment. The Commissioner granted a 20% permanent partial disability award. The employer and claimant both protested. At a subsequent protest hearing, the employer offered repeat blood gas tests performed at the Charleston Area Medical Center. The Board indicated these tests showed pneumoconiosis without any impairment. The Commissioner set aside the previous 20% award and granted the statutory 5% without impairment award. On appeal, the Appeal Board reversed the Commissioner and ordered a 10% award.

Norman J. Baldwin was employed by the Hampton Division of Westmoreland Coal Company from April 11, 1972, and had worked there for over 6 years when he filed his application for disability benefits. Prior to that he had been employed by another West Virginia colliery. On the basis of ear oxymetry studies, the Occupational Pneumoconiosis Board recommended and the Commissioner granted a 10% permanent partial disability award. Following his employer's protest, repeat ear oxymetry tests were performed. Upon evaluation of the new studies, the Board found the claimant had pneumoconiosis with no impairment. Therefore, the Commissioner set aside the previous 10% award and ordered the 5% without impairment statutory award. On appeal, the Appeal Board reversed the Commissioner's final order and granted a 7% award.

Earnest R. Birchfield had been working for Eastern Associated Coal Corporation since 1963 and filed for disability compensation in March 1979. He had also worked for one other colliery in the state from 1942 to 1960. Following examination and tests, the Occupational Pneumoconiosis Board determined that ear oxymetry tests indicated that the claimant had a 10% pulmonary impairment due to pneumoconiosis. At a hearing upon the employer's protest, the

Board reviewed repeat ear oxymetry tests requested by the employer which indicated no impairment. Although blood gas studies performed by Appalachian Pulmonary Laboratory which were offered by the employee indicated substantial impairment, blood gas studies performed at the Charleston Area Medical Center which were offered by the employer showed no impairment. Thus, there were two ear oxymetry studies, one abnormal and one normal; and two blood gas studies, one abnormal and one normal. The Board changed its recommendation to pneumoconiosis without impairment and the Commissioner accordingly entered a 5% statutory award. On appeal, the Appeal Board reversed and entered a 7% award.

James Frazier filed for disability compensation due to occupational pneumoconiosis on September 28, 1979. He had been employed by Eastern Associated Coal Corporation since 1948. Occupational Pneumoconiosis Board examination and tests revealed that Mr. Frazier had pneumoconiosis with a 10% functional impairment. Therefore, the Commissioner granted a 10% permanent disability award. The employer protested and subsequently submitted results from repeat ear oxymetry tests, which were performed in November 1981. Based upon this new evidence, the Board changed its findings to pneumoconiosis without any impairment. Consequently, the prior 10% award was set aside by the Commissioner and replaced with a 5% award. On appeal, the Appeal Board reversed this final order and granted a 7% award.

Albert L. McCarty had been working for Armco, Inc. for over 24 years when he petitioned to reopen his claim in 1979. He had previously been examined by the Occupational Pneumoconiosis Board in 1975 and was found to have pneumoconiosis with 15% impairment of pulmonary function. Mr. McCarty's petition to reopen was granted based upon medical evidence of progression of the disease. Based upon its own evaluation and the most recent evaluation by the claimant's physician, the Board found a 5% increase in impairment. Therefore, the Commissioner granted an additional 5% compensation award. The employer protested and subsequently offered into evidence repeat blood gas studies which indicated that the claimant was fully compensated by the previous 15% award. The Commissioner set aside the recent 5% increase and denied any further award. On appeal, the Appeal Board reversed and granted a 2% increase.

Dennis Racer has been employed by Armco, Inc. for various intervals since 1944. At the time he filed an application for disability compensation in 1980, he had been working for Armco continuously since 1971. The Occupational Pneumoconiosis Board examined and tested Mr. Racer and found that he had pneumoconiosis with a functional impairment of 30%. Therefore, the Commissioner granted a 30% permanent partial disability award. The employer protested and submitted results of pulmonary function studies along with a report from their examining physician which indicated a degree of impairment of approximately 15%. The Board accepted the employer's studies as more accurate because they reflected a lower pulmonary impairment and were therefore, according to the Board, a better indicator of the claimant's disability due to occupational pneumoconiosis. Therefore, the Commissioner set aside the previous 30% award and granted a 15% award. On appeal, the Appeal Board reversed the Commissioner's final order and awarded 22%.

William D. Bryant was employed by Eagle Coal and Dock Company from October 20, 1970 to February 26, 1979. Prior to that, he had been employed by several other collieries in the state since 1938. The claimant filed for pneumoconiosis compensation in April 1980. On July 21, 1981, the Occupational Pneumoconiosis Board submitted its findings, which concluded that the claimant had pneumoconiosis with 15% pulmonary function impairment. The Commissioner granted a 15% disability award. The claimant protested and underwent repeat testing at the Charleston Area Medical Center. The Board interpreted these tests to indicate 30% impairment. Also admitted into evidence were additional pulmonary

function studies performed on the claimant and reported by the employer's physician. The Board interpreted this evidence as showing 20% impairment. The Commissioner set aside the previous 15% award and granted 20%. On the claimant's appeal, the Appeal Board reversed the Commissioner and awarded 24% (6% less than the Board's original findings and 4% greater than the Board's subsequent findings).

James E. Roberts has been working for various collieries in West Virginia, Virginia, and Pennsylvania since 1947, and was employed by Ottaway Mining Corporation when he applied for disability compensation in 1977. On July 17, 1979, the Occupational Pneumoconiosis Board submitted its findings that the claimant had pneumoconiosis without measurable impairment. The claimant protested. There were a total of four additional sets of studies offered into evidence, two by the claimant and two by the employer. The Board rejected two earlier testings (one submitted by the claimant, the other submitted by the employer), because they were performed during periods of hospitalization for other reasons. Instead, the Board chose the employer's second tests over the claimant's second tests because the employer's were performed later. According to the Board, the employer's results indicated no functional impairment, while the claimant's results indicated between 20–25% impairment. On September 2, 1982, the Commissioner granted the claimant the 5% statutory award for pneumoconiosis without measurable impairment. The claimant appealed, and the Appeal Board reversed the Commissioner and awarded 10%.

Sidney Ball had been employed for nearly ten years by United States Steel Corporation and was still working for that company when he filed his application for compensation on January 29, 1979. On the basis of its examination, performed in April 1981, the Board recommended a finding of 20% impairment. Following the employer's protest to the Commissioner's 20% award, new tests were performed in September 1981. After review of these tests the Board changed its recommendation to 15% impairment, and the Commissioner then modified the previous order awarding 20% to an award of 15%. On appeal, the Commissioner's award of 15% was reversed and the claimant was granted 17% by the Appeal Board.

Othar Ball filed his application on March 7, 1979. He had ceased work in September 1978 after being employed by Omar Mining Company for nearly ten years, and having worked in other mines in West Virginia at various times since 1946. Based on the results of its own tests performed March 18, 1980, the Occupational Pneumoconiosis Board found that the claimant was suffering from pneumoconiosis with a 10% functional impairment. The employer protested this finding and submitted tests performed in November 1979, which, according to the employer's physician, showed no evidence of impairment due to pneumoconiosis. The Commissioner set aside the original 10% finding of the Board and granted a 5% statutory award. The results of tests performed in May 1980 were comparable to those performed in March, but were discounted by the Board. The Appeal Board subsequently granted the claimant a 7% permanent partial disability award.

Gene A. Bowen had been continuously employed by the Semet-Solvay Division of Allied Chemical Corporation for over twenty-five years at the time his application was filed on December 14, 1979, and, in addition, had worked for the same company on various dates since 1950. Based on studies performed in June 1976, the Board found a 25% impairment and the Commissioner granted a 25% award for disability. The employer protested the award, claiming that normal test results had been obtained in April 1978. The Board subsequently evaluated additional results submitted by both the claimant and his employer. The claimant's evidence indicated 15% impairment and the results submitted by the employer from May 1982 demonstrated no measurable impairment. The Board then changed its previous recommendation to a finding of no impairment. The Commissioner set aside the prior award and granted a 5% statutory award. The Appeal

Board subsequently awarded the claimant a 10% permanent partial disability.

Roy L. Hendricks was employed by Buffalo Mining Company at Lyburn, West Virginia for over ten years when his application for compensation was filed on April 7, 1981. The Board found a 10% impairment based on its studies performed in December 1981. The employer objected to the Board's findings and to the 10% award granted by the Commissioner. New tests performed in March 1982 at the employer's request persuaded the Board to change its opinion to a finding of no impairment, and the Commissioner then changed the amount awarded from 10% to the 5% indicated by statute. On appeal, the Appeal Board ordered a 7% award, reversing the Commissioner's 5% order.

Johnny O'Neal was employed by Imperial Colliery Company when his application was filed on January 15, 1980, and had worked for the company for ten years. Based on its own medical evidence and that submitted by the claimant, the Board found that the claimant suffered from a 15% impairment of pulmonary function. The Commissioner granted an award in accordance with these findings. This award was protested by the employer, who requested further tests. The results of these additional tests were submitted at a protest hearing, and caused the Board to alter its earlier opinion to a finding of no impairment. The Commissioner then set aside the claimant's previous award and granted a 5% permanent partial disability. The Appeal Board subsequently reversed the Commissioner's order of 5% and granted 10% to the claimant as compensation.

Ronald Browning received a previous permanent partial disability award of 20% in 1978. He had been employed by Amherst Coal Company for nearly thirty years at the time his application for reopening was filed on February 4, 1980. Upon the reopening of this claim, the Board evaluated the results obtained from its own examination along with several results from studies performed in 1980. The Board found a 25% impairment, entitling the claimant to a 5% increase in his previous award. The employer objected to this increase and requested additional testing which was performed in April 1981. The results of these tests indicated that the claimant had suffered no further impairment since his previous award. The Board therefore found that the claimant had been fully compensated by the previous 20% award and no increase was necessary. The Commissioner acted on these findings by denying any further award. The Appeal Board, however, granted the claimant a 2% increase, for a total award of 22%.

Van B. Curry had been granted a 15% award for a claim filed in 1975. At the time he reopened his claim, on October 5, 1978, he had been employed for five continuous years by Island Creek Coal Company. He had also previously worked for the same company at various times since 1955. The Board submitted findings stating that the claimant had suffered no further impairment since his previous award of 15%. The claimant protested these findings. The Board then evaluated test results submitted by the claimant which indicated an impairment of 40% along with other, more recent, tests which were performed at the employer's request that indicated only a 15% impairment. The Board recommended that no further compensation be granted, and the Commissioner affirmed the previous order denying further compensation. Despite this finding, the Appeal Board reversed the Commissioner's order and granted the claimant a 10% increase for a total award of 25%.

John Hunt had been employed in the coal industry for about thirty-nine years, and for thirteen years consecutively by National Coal Mining Company, when he filed an application for compensation on April 2, 1979. The Board considered its own test results and those obtained from studies performed in March 1978, and found 25% functional impairment. Subsequently, the Commissioner granted a 25% award. The claimant's employer protested this award and requested new tests, which were performed in April 1981. The results of these tests were evaluated by the Board along with results of a previous blood gas study submitted by the claimant. The Board be-

lieved that the employer's test results demonstrated an impairment of only 10%. The Commissioner then set aside the previous order and modified the 25% award to 10%. The Appeal Board reversed the Commissioner's order, increasing the award to 15%.

John P. Sizemore had been employed by Amherst Coal Company for over thirty years when his application for compensation was filed on November 14, 1980. The Board decided that, based on test results submitted by the claimant, a 25% functional impairment was present. The Commissioner then granted an award in accordance with the Board's findings. After the employer's objection, a protest hearing was held and new test results submitted by the employer were considered. The Board thereafter changed its finding to a lesser degree of impairment and the Commissioner subsequently reversed the earlier award and granted the claimant 20% as compensation. The Appeal Board later reversed the 20% award and ordered an award of 22%.

John Jude had been employed by Eastern Associated Coal Corporation for over thirty years at the time his application was filed on August 31, 1979. Based on x-ray evidence and other test results, the Board found the existence of a 25% functional impairment. The claimant's employer protested the Commissioner's 25% award and submitted later studies illustrating an impairment of only 15% according to the Board. The Commissioner followed the Board's revised recommendation and reduced the previous award to 15%. The claimant appealed this order and was subsequently granted a 19% award by the Appeal Board.

II.

The first question presented is whether the Workers' Compensation Appeal Board has properly evaluated the medical evidence according to legal standards applicable in occupational pneumoconiosis cases. The appellants contend that the Appeal Board failed to properly apply these standards, particularly the liberality rule as articulated in *Persiani v. State Workmen's Compensation Commissioner*, 162 W.Va. 230, 248 S.E.2d 844 (1978). The appellees, on the other hand, maintain that the Appeal Board complied fully with the *Persiani* evidentiary standards since it "considered" all the medical evidence in calculating its awards.

In the single syllabus point of *Persiani*, *supra*, this Court stated:

In claims under the Workmen's Compensation Act, W.Va.Code, 23–1–1 [1971] *et seq.* for disability resulting from occupational pneumoconiosis where conflicting results from blood gas studies are introduced into evidence one of which is favorable to the claimant and one of which is unfavorable, the Commissioner is required to apply the liberality rule in the same manner as in other cases involving the evaluation of medical evidence, and while he is not required under the liberality rule to accept any particular result as dispositive of the case, he may not arbitrarily choose to disbelieve any competent medical testimony in its entirety or to exclude it from consideration altogether, absent credible evidence in the record that the suspect testimony is unreliable.

According to medical experts, occupational pneumoconiosis is a permanent and progressive disease that does not improve over time.[3] Based upon this premise, the Occupational Pneumoconiosis Board has concluded that, when presented with two or more sets of pulmonary function studies, if subsequent studies produce results indicating a lesser degree of impairment, previous studies, to the extent they show a higher degree of impairment, indicate something other than occupational pneumoconiosis.[4]

---

3. *See* 4A *Gray & Gordy, Attorneys' Textbook of Medicine* ¶¶ 205.70 & 205B.21 (Matthew-Bender 1984).

4. Examples of other possible factors are asthma, acute pulmonary infections, pneumonia, bronchitis, or other pulmonary or physical conditions existing at the time of the testing. *See* 4A

*Gray & Gordy, Attorneys' Textbook of Medicine* ¶¶ 205.65 & 205B.40 (Matthew-Bender 1984). It should be noted, however, that as we stated in *Sisk v. State Workmen's Compensation Comm'r*, 153 W.Va. 461, 469, 170 S.E.2d 20, 25 (1969): "A disability which cannot with some degree of certainty be attributed to a cause other than the

Given this analysis, the same conclusion is also reached where the results indicating less impairment are obtained immediately prior to those indicating a higher degree of impairment, thereby eliminating the normal progression of occupational pneumoconiosis as the cause of the higher impairment results. In either case, the Board is precluded from accepting any test result other than that least favorable to the claimant in order to remain consistent with their own reasoning.

The appellees contend that the liberality rule is in unavoidable conflict with the generally accepted medical proposition that pneumoconiosis is a progressive disease. We disagree. When initial pulmonary function studies indicate a certain degree of impairment and subsequent studies produce results indicating less or no impairment, the most acceptable medical inference may very well be that the extent of higher impairment indicated in the prior studies is attributable to factors other than occupational pneumoconiosis. To say, however, that this medical presumption precludes application of the liberality rule misses the point made in *Persiani:*

> All tests are performed by men and women who are subject to human error, philosophical predisposition, and even, occasionally, unimaginative cupidity. While the people administering these tests, evaluating the tests, and entering orders based upon the tests perform those routine functions scores of times every month, the claimant is possessed of only one set of lungs and one limited life expectancy.

162 W.Va. at 236–237, 248 S.E.2d at 848.

Each method of testing for pulmonary impairment involves a combination of human skill and medical technology. Associated with this combination is not only the possibility of accuracy, but also the possibility of inaccuracy due to technician error, faulty equipment, or any number of other potential problems.

As the records of these cases before us illustrate, there are often two or more sets of test results on a particular claimant. The Occupational Pneumoconiosis Board's function is to determine, based upon their own examinations and any evidence from examinations produced by physicians on behalf of the claimant and employer, whether there is medical evidence of occupational pneumoconiosis. West Virginia Code § 23–4–8a (1981 Replacement Vol.). The Board must then submit its findings to the Commissioner in a written report. The Board's opinions as to the extent of occupational pneumoconiosis are, in the final analysis, a judgment based not only on objective factors, but also on subjective factors such as the presumption in favor of the results showing the least impairment. It is still for the Commissioner to review their findings, as well as all other evidence, to determine what percentage of disability exists.[5] The Occupational Pneumoconiosis Board assists the Commissioner by interpreting its own test and examination results and those presented by employers and claimants from other laboratories and physicians.

■ The Occupational Pneumoconiosis Board, the Commissioner, and the Appeal Board, as finders of fact, are not entitled to disbelieve evidence based exclusively upon subjective evaluation of credibility. *Persiani*, 162 W.Va. at 236, 248 S.E.2d at 848. The issue of the credibility of particular medical evidence primarily arises when there are different test results, each medically valid, which conflict as to the degree of pulmonary impairment. To give peculiar weight to one set of results solely because it indicates the lowest degree of impairment does not give due recognition

---

subject injury must be presumed to have resulted from such injury."

**5.** As West Virginia Code §§ 23–4–6(a) and 23–4–6(f) (1981 Replacement Vol.) make clear, it is the exclusive responsibility of the Commissioner to make the final determination of the percentage of permanent disability. "[T]he findings and conclusions of the occupational pneumoco-

niosis board do not constitute an award of compensation but are information to be considered by the commissioner in making his decision. Such findings and conclusions constitute evidence and nothing more." *Hamrick v. State Workmen's Compensation Comm'r*, 159 W.Va. 840, 228 S.E.2d 702, 703 (1976).

to the fact that results indicating a higher degree of impairment may very well be a technically more accurate indicator of the actual degree of impairment caused by occupational pneumoconiosis. While it may be a medical fact that occupational pneumoconiosis does not improve over time, this does not give rise to any legal presumption that subsequent results showing lower impairment are a more accurate indicator of the extent of impairment actually attributable to pneumoconiosis. Under the State's Worker's Compensation Act, occupational pneumoconiosis is considered on equal standing with more traditionally recognized sorts of work-related injuries. *See* West Virginia Code § 23–4–1 (1981 Replacement Vol.). And, "[i]t has long been held in this jurisdiction that a disability which cannot with some degree of certainty be attributed to a cause other than the subject injury must be presumed to have resulted from such injury." *Sisk v. State Workmen's Compensation Commissioner*, 153 W.Va. 461, 469, 170 S.E.2d 20, 25 (1969).

■ Given two or more pulmonary impairment findings, the ultimate legal question to be resolved is the extent of impairment attributable to occupational pneumoconiosis. In all types of compensation cases, conflicts in evidence, medical or otherwise, are to be construed in favor of the claimant. The time-honored liberality rule is not only a rule of statutory construction, but is also an evidentiary rule. *Workman v. Workmen's Compensation Commissioner*, 160 W.Va. 656, 236 S.E.2d 236, 238 (1977); *Pennington v. State Workmen's Compensation Commissioner*, 154 W.Va. 378, 387, 175 S.E.2d 440, 445 (1970); *Pripich v. State Compensation Commissioner*, 112 W.Va. 540, 543, 166 S.E. 4, 5 (1932). It should be clear that in evidentiary matters the law dictates that the claimant be given the benefit of all reasonable inferences the record will allow; and any conflicts must be resolved in favor of the claimant. *Persiani*, 162 W.Va. at 232, 248 S.E.2d at 846; *Myers v. State Workmen's Compensation Commissioner*, 160 W.Va. 766, 239 S.E.2d 124, 126 (1977); *McGeary v. State Compensation Director*, 148 W.Va. 436, 438–39, 135 S.E.2d 345, 347 (1964). As

stated in *Persiani*, that is not to say the Commissioner or Appeal Board is automatically required to accept as dispositive the most favorable evidence as the degree of functional impairment due to pneumoconiosis. For example, proof that the higher impairment results are unreliable due to medically inadequate testing, incorrect due to technical error, the product of intentional misrepresentation, or clearly attributable to an identified medical problem of the claimant other than pneumoconiosis, would establish proper evidentiary ground upon which to exclude or partially discount these findings.

■ If the legal rule of liberality is ignored in occupational pneumoconiosis claims, given the previously mentioned medical position and its accompanying "attributable to some other factors" factual presumption, the regularly occurring conflicts in evidence would automatically and invariably be resolved in favor of the figures indicative of the lowest degree of impairment. This directly conflicts with the remedial purposes of the State's workers' compensation system and its legal standards of proof. Employers are shielded from common law liability by the Workers' Compensation Act. The *quid pro quo* for the employees is the guarantee that they will be afforded due process, and proper restitution for injuries they receive in their line of work. As stated in *Pripich v. State Compensation Commissioner*, 112 W.Va. at 543, 166 S.E. at 5, "[where] only probable or conjectural reasons or causes are assigned by physicians in an effort to explain the disabilities on grounds other than the injury, the presumptions should be resolved in favor of the employee rather than against him." Therefore, the legal standards by which the Commissioner and Appeal Board are bound preclude reliance upon a inference derived by merely juxtaposing separate results of medical tests. When conflicting medical evidence is presented concerning the degree of impairment in an occupational pneumoconiosis claim, that medical evidence indicating the highest degree of impairment, which is not otherwise shown, through explicit findings of fact by the Occupational Pneumoconiosis

Board, to be unreliable, incorrect, or clearly attributable to some other identifiable disease or illness, is presumed to accurately represent the level of pulmonary impairment attributable to occupational pneumoconiosis. Policy considerations underlying the liberality rule dictate this legal standard.

Accuracy and reliability are at the core of the evidentiary issues presented in these cases. We note that the highly respected Occupational Pneumoconiosis Board, in its own examinations and tests, reports that it employs an extensive multi-component procedure.[6] The American Medical Association also attempts to promote such uniform procedures and evaluation criteria to obtain reasonably accurate and consistent assessments of pulmonary impairment.[7] It should be noted that in addition to its own evaluations,[8] the Occupational Pneumoconiosis Board must also interpret medical test results submitted by employers and claimants.

In the interest of all parties involved in compensation claims, the Legislature has specifically mandated that; "The Commissioner shall adopt reasonable rules of procedure, regulate and provide for ... the nature and extent of the proofs and evidence, the method of taking and furnishing the same to establish the rights to benefits or compensation ... and the method of making ... physical examinations ...." West Virginia Code § 23–1–13 (1981 Replacement Vol.). In order to assure the utilization of proper examination and evaluation techniques for the measurement of pulmonary impairment attributable to occupational pneumoconiosis, the Workers' Compensation Commissioner is required under West Virginia Code § 23–1–13 (1981 Replacement Vol.) to promulgate rules and regulations specifying examination and evaluation criteria to guide the Occupational Pneumoconiosis Board in its own examination and evaluation of occupational pneumoconiosis claimants, and to guide other physicians who conduct examinations and evaluations of occupational pneumoconiosis

---

6. When a claimant is examined by the Board a complete medical history is obtained. Any history of treatment for medical problems, heart or lung disease, particularly heart attack or high blood pressure is noted, as well as, any other restrictions upon the claimant's activity which would make exercise hazardous to the claimants. Particular attention is given to whether the claimant has smoked cigarettes, and if so to what extent. The clinical members of the Board conduct a physical examination of the claimant, giving particular attention to the lungs and heart as well as to any crippling injuries the claimant may have sustained. If the claimant is able to exercise safely a simple standardized exercise is conducted under close supervision.

X-ray films of the chest are made under the supervision of the Roentgenologist member of the Board, using the most exacting techniques necessary to show the smallest changes in the lungs due to pneumoconiosis. The Federal Coal Mine Health and Safety Act of 1969 established standards for film quality and technical methods to be employed in making x-rays. The specifications of the Federal Act are being followed by the Board. It should be noted that the diagnostic changes in the chest x-rays have become thoroughly familiar to the Board during its may [sic] years of experience. In addition to the examination of its own chest x-rays, the Board reviews all such x-rays previously made and available for consideration and comparison as evidence of any changes which may occur. Pulmonary func-

tion testing is conducted for the Board as a means of identifying the loss of lung function and the extent to which such loss has impaired the claimant's ability to work.

\* \* \* \* \* \*

West Virginia was the first State to adopt pulmonary function as a routine method of evaluation of impairment. The pulmonary function studies include:

1. Forced Expiratory Volume (Total, 1 Second and 3 Seconds)
2. Forced Expiratory Volume (200–1200) (Maximum expiratory flow rate (MEFR)
3. Forced Expiratory Volume (25%–75%) Mid Maximum expiratory flow rate (MMEFR)
4. Maximum Voluntary Ventilation
5. Airway Resistance
6. Ear Oximetry Studies
7. Diffusion Studies
8. Blood Gas Studies (when requested)

Occupational Pneumoconiosis Board, Annual Report, July 1982 through June 1983.

7. AMA Committee on Rating Mental and Physical Impairment, Guides to the Evaluation of Permanent Impairment, Chapter IV—*The Respiratory System* (1977).

8. During the last reporting period the Board examined and tested 2069 claimants and reviewed 112 fatal cases. Occupational Pneumoconiosis Board, Annual Report, July 1982 through June 1983.

claimants on behalf of those claimants and their employers. These regulations should permit claimants and employers to meet the accuracy and reliability requirements of the Occupational Pneumoconiosis Board; and give notice of the evaluation criteria employed by this medical body which assists the Commissioner by interpreting the medical evidence in each case.

### III.

█ It is apparent from the pattern of awards in the cases at hand that the Board of Appeal has attempted to reconcile the previously discussed medical proposition and its resulting factual inference with the legally recognized evidentiary standards under the liberality rule. The end result in each claim has generally been an arbitrary "splitting of the difference" between the Occupational Pneumoconiosis Board's and Commissioner's initial findings and award, and their post-protest findings and award. An injured employee's claim that is arrived at by resort to a simple mathematical compromise is wholly improper and will be reversed as it is clearly not based on the evidence. Such procedure is something akin to quotient and compromise verdicts and their attendant evils and will not be sanctioned. *See Kimball v. Walden,* 171 W.Va. 579, 301 S.E.2d 210, 213–15 (1983); *England v. Shufflebarger,* 152 W.Va. 662, 666, 166 S.E.2d 126, 129 (1969).

█ This Court has in the past and today states again that whatever the findings are, the factors and reasons for reaching such a finding must be clearly stated in the order of the Appeal Board.[9] *See Cardwell v. State Workmen's Compensation Commissioner,* 171 W.Va. 700, 301 S.E.2d 790, 797 (W.Va.1983); *Posey v. State Workmen's Compensation Commissioner,* 157 W.Va. 285, 296, 201 S.E.2d 102, 108 (1973); *Kamensky v. State Compensation*

*Commissioner,* 148 W.Va. 258, 262, 134 S.E.2d 582, 584 (1964). A duty to find the facts carries with it a duty to give all parties proper notice as to how and why those facts were found. If there were proper evidentiary grounds in some or all of these cases to discount or exclude the most favorable evidence, they were not set out in the orders of the Commissioner or Appeal Board. We therefore hold that an occupational pneumoconiosis award may not be calculated by splitting the difference between initial findings or awards and subsequent findings or awards. Rather, when conflicting findings or awards are presented to the Workers' Compensation Appeal Board, those findings or awards indicating the highest degree of impairment, which are not otherwise shown, through explicit findings of fact by the Appeal Board, to be unreliable, incorrect, or clearly attributable to some other indentifiable disease or illness, are presumed to correctly represent the level of pulmonary impairment attributable to occupational pneumoconiosis.

### IV.

█ The claimants also present a motion seeking reimbursement of attorney fees and other expenses under *Meadows v. Lewis,* 172 W.Va. 457, 307 S.E.2d 625 (1983). In *Meadows,* the issue of fees and expenses was properly before this Court in a mandamus action seeking to compel Commissioner compliance with her statutory duties. In the present action, however, the issue of fees and expenses was not raised in the claimants' petitions for appeal, and is not properly presented on appeal. Subsequent to *Meadows,* the Commissioner has promulgated rules and regulations governing the award of attorney fees and expenses. *See West Virginia Administrative Regulations, Workers' Compensation Commissioner,* Chapter 23–5, Series IV (1984).

---

9. West Virginia Code § 23–5–3 (1981 Replacement Vol.) states in pertinent part:

The board shall set a time and place for the hearing of arguments on each claim and shall notify the interested parties thereof, and briefs may be filed by the interested parties in accordance with the rules of procedure prescribed by the board. And thereupon, after a review of the case, the board shall sustain the finding of the commissioner or enter such order or make such award as the commissioner should have made, *stating in writing its reasons therefor,* and shall thereupon certify the same to the commissioner, who shall proceed in accordance therewith. (Emphasis added).

Therefore, we remand this issue to the Commissioner for determination under those rules.

Accordingly, the orders of the Appeal Board are reversed and all cases are remanded to the Commissioner with directions (1) to review the medical evidence and enter an appropriate order in each case in light of our holding that medical evidence indicating the highest degree of impairment is presumed to accurately represent the level of pulmonary impairment attributable to occupational pneumoconiosis unless otherwise shown to be unreliable, incorrect, or clearly attributable to some other disease or illness; (2) to promulgate rules and regulations specifying examination and evaluation criteria to guide the Occupational Pneumoconiosis Board in its own examination and evaluation and evaluation of occupational pneumoconiosis claimants, and to guide other physicians who conduct examinations and evaluations of occupational pneumoconiosis claimants on behalf of those claimants and their employers; and (3) to consider the appellants' motions for fees and expenses under her rules and regulations.

Reversed and remanded.

NEELY, Justice, dissenting:

I dissent to the majority opinion in these consolidated cases on the grounds that the majority opinion in Syllabus Point 3 has made a travesty of the fact-finding function of the Workers' Compensation Commissioner and the Appeal Board. By requiring either the Commissioner or the Appeal Board to find specifically that testimony introduced by a claimant is "unreliable, incorrect, or clearly attributable to some other identifiable disease or illness," this Court has now said that it will dispense with even the appearance of even-handed justice.

The majority opinion takes the final step in the extension of the liberality rule. It is no longer sufficient for employers to prove their case by a preponderance of the evidence in the face of the added weight that the liberality order gives to the claimant's case. It is now necessary for the employer, after proving his own case, to disprove the claimant's case! I have never been very enthusiastic about the statutory scheme for adjudicating workers' compensation claims and I expressed those reservations in *Persiani v. S.W.C.C.*, 162 W.Va. 230, 248 S.E.2d 844 (1978). Nonetheless, until the Legislature changes our procedures I would prefer not to make a joke out of the process. I stand, therefore, upon the liberal, but not entirely absurd rules concerning proof of occupational pneumoconiosis claims set forth in *Persiani, supra*, and for that reason dissent.