531 S.E.2d 66

**George W. THACKER, Appellant,**

v.

**WORKERS' COMPENSATION DIVISION and Steel of West Virginia, Inc., Appellees.**

No. 26197.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 3, 1999.

Decided Dec. 2, 1999.

Concurring Opinion of Chief Justice Starcher March 1, 2000.

---

Robert M. Williams, Esq., Thomas P. Maroney, L.C., Charleston, West Virginia, Attorney for the Appellant.

Douglas G. Lee, Esq., Ancil G. Ramey, Esq., H. Toney Stroud, Esq., Steptoe & Johnson, Charleston, West Virginia, Attorneys for the Appellee Steel of West Virginia, Inc.

PER CURIAM:

This appeal from the Workers' Compensation Appeal Board ("Appeal Board") concerns the application of *Javins v. Workers' Compensation Comm'r,* 173 W.Va. 747, 320 S.E.2d 119 (1984), our seminal case on the interpretation of evidence in a workers' compensation occupational pneumoconiosis claim. In this case—as in many identical workers' compensation cases—both the Workers' Compensation Office of Judges ("Office of Judges") and the Appeal Board ignored the evidentiary rules for workers' compensation claims set forth in the *West Virginia Code,* and ignored the plain terms of our interpretation of those rules in *Javins.*

The Appeal Board in this case affirmed an order of the Office of Judges that reduced a claimant's workers' compensation permanent partial disability award from 15% to 5%, disregarding reliable evidence that the claimant had a 15% impairment to his breathing capacity. Because of the Appeal Board's and the Office of Judges' failure to apply the well-established evidentiary rules set forth below, we reverse the Appeal Board's decision.

## I.

Beginning in 1965, the appellant, George W. Thacker, was employed by appellee Steel of West Virginia, Inc. at its facility in Huntington, West Virginia. In the course of Mr. Thacker's employment as a machine operator he was routinely exposed to substantial amounts of dust. As a result of this exposure to dust the appellant developed occupational pneumoconiosis, "a disease of the lungs caused by the inhalation of minute particles of dust over a period of time due to causes and conditions arising out of and in the course of the employment." *W.Va.Code,* 23–4–1 [1995].

In late 1991, while the appellant was still working for the appellee, he filed a claim seeking workers' compensation benefits for his occupational pneumoconiosis. On September 21, 1992, the West Virginia Workers' Compensation Division ("Division") ruled that the appellant met the statutory requirements to be eligible for workers' compensation benefits. The Division referred the appellant to the Occupational Pneumoconiosis Board ("OP Board") for medical testing to determine whether, and if so to what extent, the appellant had a lung injury caused by the inhalation of dust.

The OP Board examined the appellant on February 16, 1993. By the examination of x-ray films, the OP Board diagnosed the appellant with occupational pneumoconiosis. Pulmonary function testing was also performed by the OP Board, and based upon these test results the OP Board concluded that the appellant had sustained a 15% impairment as a result of his lung injury.[1] Based upon the OP Board's conclusions, the Division entered

---

1. A pulmonary function test is a test that measures the maximum amount of air that a claimant can inhale and exhale. Those test results are then compared against the predicted breathing results of an "average" person. Predicted breathing results are derived from a statistical analysis of a population of persons with "normal" breathing. If the breathing results of the claimant are significantly less than the predicted results, and that difference between the results can be linked to the claimant's exposure to dust, mist, fumes or other occupational lung hazards, then the claimant is considered to be impaired.

The precise percentage of impairment, for purposes of workers' compensation benefits, is determined by consulting a chart in regulations promulgated by the Workers' Compensation Commissioner. *See* 85 *Code of State Regulations* 1, § 20.8.7, "Table for Impairment of Pulmonary Function."

an order on March 8, 1993 granting the appellant a 15% permanent partial disability award.

The appellee-employer protested the Division's order to the Office of Judges, compelling the appellant to submit to a second pulmonary function test on October 11, 1995. At a hearing held on August 20, 1997 before an administrative law judge, the OP Board reviewed the employer's pulmonary function test results as well as the Board's pulmonary function test results. The OP Board did not specifically find that its own earlier test results, which formed the basis for the appellant's initial 15% permanent partial disability award, were unreliable. Instead, the chairman of the OP Board, Dr. James H. Walker, testified that he thought the employer's pulmonary function test was "the best study" and that the employer's test was "the most reliable and accurate study to show any pulmonary impairment." Based upon the employer's pulmonary function test results, the members of the OP Board testified that "there is no valid evidence of any pulmonary impairment" in the appellant.

On October 20, 1997, the Office of Judges entered an order reversing the Division's Order of March 8, 1993. The Office of Judges concluded, based upon the OP Board's testimony, that the appellant "has no impairment of pulmonary function." The order therefore concluded that the appellant could only receive a 5% permanent partial disability award on the basis of his x-ray diagnosis of occupational pneumoconiosis.[2]

The appellant appealed the order of the Office of Judges to the Workers' Compensation Appeal Board. On May 29, 1998, the Appeal Board, in a one-page order, affirmed the decision of the Office of Judges. This appeal was then filed.

2. The 5% award for a diagnosis of occupational pneumoconiosis without breathing impairment is established by *W.Va.Code*, 23-4-6a [1995], which states, in pertinent part, that:
> ... if it shall be determined by the division in accordance with the facts in the case and with the advice and recommendation of the occupational pneumoconiosis board that an employee has occupational pneumoconiosis, but without measurable pulmonary impairment therefrom, such employee shall be awarded and paid twenty weeks of benefits[.]

## II.

The Workers' Compensation Act specifically provides that the Division, the Office of Judges, and the Appeal Board are to construe the evidence in workers' compensation claims in a manner that ensures that the rights of the claimant are protected. *W.Va. Code*, 23-1-15 [1923] states:

> The [workers' compensation] commissioner shall not be bound by the usual common-law or statutory rules of evidence, but shall adopt formal rules of practice and procedure as herein provided, and may make investigations in such manner as in his judgment is best calculated to ascertain the substantial rights of the parties and to carry out the provisions of this chapter.

Since the passage of *W.Va.Code*, 23-1-15 in 1913, this Court has interpreted the statute to require that a spirit of liberality in favor of the claimant be employed in applying the provisions of the Workers' Compensation Act. "[W]e must remember that our legislature has shown an earnest endeavor above everything else to give material justice its due while formal rules of jurisprudence are pushed aside." *Machala v. State Compensation Comm'r*, 109 W.Va. 413, 415, 155 S.E. 169, 170 (1930).

Under the provisions of *W.Va.Code*, 23-1-15, the Division is required "in administering the workmen's compensation fund to ascertain the substantial rights of the claimants in such manner as will 'carry out justly and liberally the spirit of the act[.]'" Syllabus, *Culurides v. Ott*, 78 W.Va. 696, 90 S.E. 270 (1916). To put this statutory intent into practice, this Court has repeatedly held that the statute imposes upon the Division a "duty ... to give the claimant the benefit of infer-

Every workers' compensation award is "computed on the basis of four weeks' compensation for each percent of disability[.]" *W.Va.Code*, 23-4-6(e)(1) [1995]. Combining the two statutes, because the claimant was diagnosed with occupational pneumoconiosis with no measurable pulmonary impairment, he was entitled to 20 weeks of benefits, or a 5% permanent partial disability award.

ences arising in his favor from the facts proved ..." Syllabus Point 3, *Poccardi v. Public Service Commission,* 75 W.Va. 542, 84 S.E. 242 (1915). When the Division is presented with conflicting evidence, "the presumptions should be resolved in favor of the employee rather than against him." Syllabus Point 1, *Pripich v. State Compensation Comm'r,* 112 W.Va. 540, 166 S.E. 4 (1932).

More recently, this Court has summarized this "rule of liberality" in the following manner: "In all types of compensation cases, conflicts in evidence, medical or otherwise, are to be construed in favor of the claimant." *Javins v. Workers' Compensation Comm'r,* 173 W.Va. 747, 758, 320 S.E.2d 119, 130 (1984). *See also, Workman v. Workmen's Compensation Comm'r,* 160 W.Va. 656, 236 S.E.2d 236 (1977); *Myers v. State Workmen's Compensation Comm'r,* 160 W.Va. 766, 239 S.E.2d 124 (1977); *Pennington v. State Workmen's Compensation Comm'r,* 154 W.Va. 378, 387, 175 S.E.2d 440 (1970); *McGeary v. State Compensation Director,* 148 W.Va. 436, 438–39, 135 S.E.2d 345 (1964); *Demastes v. State Compensation Comm'r,* 112 W.Va. 498, 165 S.E. 667 (1932).

In *Persiani v. SWCC,* 162 W.Va. 230, 248 S.E.2d 844 (1978) we specified that the rule of liberally interpreting evidence in favor of the claimant is to be applied in occupational pneumoconiosis claims. We described the liberality rule as one "which mandates that reputable evidence favorable to the claimant be considered and the claimant treated as generously as any reasonable view of the evidence would justify." 162 W.Va. at 236, 248 S.E.2d at 848 (1978).

*Persiani* presented the Court with the question of how the rule of liberality should be applied "when the claimant introduces expert testimony on disability to the Occupational Pneumoconiosis Board who, as experts themselves, disbelieve the claimant's evi-

dence and find the evidence of the employer's examining experts more credible[.]" The question raised in *Persiani* is nearly identical to the issue in this case, where the OP Board similarly concluded that the employer's pulmonary function tests, which indicated that the appellant had no respiratory impairment, were "more reliable" than the OP Board's test results indicating a 15% impairment.

This approach used by the OP Board in *Persiani* for interpreting evidence in pneumoconiosis claims was specifically rejected by this Court. We specified that the Division may not accept the OP Board's recommendation to "arbitrarily choose to disbelieve any competent medical testimony in its entirety or to exclude it from consideration altogether, absent credible evidence in the record that the suspect testimony is unreliable." Syllabus, *Persiani.*[3]

*Persiani* concerned the use of blood gas studies as evidence of breathing impairment in an occupational pneumoconiosis claim. The rule of liberality discussed in *Persiani* has at times been mistakenly interpreted as being limited only to evidence of blood gas studies, and this Court has seen argument to the effect that the rule does not apply to other types of evidence in occupational pneumoconiosis claims. *See, e.g., Kubachka v. State Workmen's Compensation Comm'r,* 163 W.Va. 601, 259 S.E.2d 21 (1979).

In *Javins v. Workers' Compensation Comm'r,* 173 W.Va. 747, 320 S.E.2d 119 (1984), we made absolutely clear that the rule of liberality applies to all types of evidence concerning the degree of impairment caused by an occupational pneumoconiosis. When the parties in a workers' compensation claim introduce reliable, conflicting medical reports regarding the degree of impairment caused by occupational pneumoconiosis, the Division, Office of Judges and Appeal Board must give the claimant "the benefit of all reasonable

---

**3.** We held in the Syllabus of *Persiani* that:

In claims under the Workmen's Compensation Act, *W.Va.Code,* 23–1–1, [1971] *et seq.* for disability resulting from occupational pneumoconiosis where conflicting results from blood gas studies are introduced into evidence, one of which is favorable to the claimant and one of which is unfavorable, the Commissioner is required to apply the liberality rule in the same

manner as in other cases involving the evaluation of medical evidence, and while he is not required under the liberality rule to accept any particular result as dispositive of the case, he may not arbitrarily choose to disbelieve any competent medical testimony in its entirety or to exclude it from consideration altogether, absent credible evidence in the record that the suspect testimony is unreliable.

inferences the record will allow; and any conflicts must be resolved in favor of the claimant." 173 W.Va. at 758, 320 S.E.2d at 130. As we stated, in Syllabus Points 1 and 3 of *Javins* [with a footnote added]:

1. When conflicting medical evidence is presented concerning the degree of impairment in an occupational pneumoconiosis claim, that medical evidence indicating the highest degree of impairment, which is not otherwise shown, through explicit findings of fact by the Occupational Pneumoconiosis Board,[4] to be unreliable, incorrect, or clearly attributable to some other identifiable disease or illness, is presumed to accurately represent the level of pulmonary impairment attributable to occupational pneumoconiosis.

\*　　\*　　\*

■ 3. An occupational pneumoconiosis award may not be calculated by splitting the difference between initial findings or awards and subsequent findings or awards. Rather, when conflicting findings or awards are presented to the Workers' Compensation Appeal Board, those findings or awards indicating the highest degree of impairment, which are not otherwise shown, through explicit findings of fact by the Appeal Board, to be unreliable, incorrect, or clearly attributable to some other identifiable disease or illness, are

presumed to accurately represent the level of pulmonary impairment attributable to occupational pneumoconiosis.

We interpret the rule set forth in *W.Va. Code*, 23–1–15 and *Javins* to be quite simple: if the parties to a workers' compensation claim introduce reliable, conflicting evidence about the degree of respiratory impairment caused by or attributable to occupational pneumoconiosis, then the Division, the Office of Judges and the Appeal Board must award the claimant benefits based upon the reliable evidence that shows the highest degree of impairment. The claimant must be given the benefit of all reasonable inferences the record will allow, and any conflicts in the evidence must be resolved in favor of the claimant.

The basis for our ruling in *Javins* is that it is difficult, if not impossible, to precisely determine the degree of a claimant's breathing impairment caused by occupational pneumoconiosis, or to separate out non-occupational causes. "Each method of testing for pulmonary impairment involves a combination of human skill and medical technology. Associated with this combination is not only the possibility of accuracy, but also the possibility of inaccuracy due to technician error, faulty equipment, or any number of other potential problems." *Javins*, 173 W.Va. at 757, 320 S.E.2d at 129.[5] *In accord, Persiani,*

---

4. This language in Syllabus Point 1 of *Javins*, that the "unreliability" of evidence must be shown "through explicit findings of fact by the Occupational Pneumoconiosis Board," is technically incorrect. The OP Board does not statutorily make legal findings of fact in a claim.

*W.Va.Code*, 23–4–8c [1993] only authorizes the OP Board to make a report of its "findings and conclusions on every medical question in controversy," and to inform the Division of those findings and conclusions. The Division is ultimately responsible for reviewing and investigating the claimant's condition, taking into account the OP Board's report. *W.Va.Code*, 23–5–1 [1995].

When the parties protest a decision made by the Division in an occupational pneumoconiosis claim, it is the administrative law judges employed by the Office of Judges, not the members of the OP Board, who are charged with independently making "findings of fact and conclusions of law[.]" *W.Va.Code*, 23–5–9 [1995].

5. The American Thoracic Society has also recognized that pulmonary function test results may vary for a host of different, uncontrollable rea-

sons. The Society recognizes that equipment used to measure breathing impairment has substantial variability, and that an accurate measure of impairment with such equipment "is not easy to establish." American Thoracic Society, "Lung Function Testing: Selection of Reference Values and Interpretive Strategies," 144 *Am.Rev. of Resp. Disease* 1202, 1203 (1991). The Society has found that a piece of pulmonary function testing equipment can be precise, meaning it consistently repeats measurements, but can still be inaccurate in that those measurements cannot be repeated on another machine. "Because most instruments have better precision than accuracy, between-instrument variation usually contributes more to total measurement variability than within-instrument variation." *Id.*

The Society has identified many of the factors that can cause differences between pulmonary function test results, including the instrument used, the subject's posture, the person observing the test, the software used in the equipment, the temperature and altitude where the test is performed, and diurnal, seasonal and endocrinologic effects on the patient. *Id.*

162 W.Va. at 236, 248 S.E.2d at 848. ("All tests are performed by men and women who are subject to human error, philosophical predisposition, and even, occasionally, unimaginative cupidity.")

Accordingly, because it is impossible to measure and account for these variations between test results, when confronted with conflicting medical evidence on the existence, cause or degree of impairment, the Division, Office of Judges and Appeal Board may not base a disability determination on evidence that the OP Board suggests is the "most reliable." Disability determinations must be made upon that evidence that is reliable and most favorable to the claimant.

■ In the case before us today, the pulmonary function testing performed by the OP Board supported a 15% permanent partial disability award. There is nothing in the record to suggest that the OP Board's test was unreliable. The subsequent pulmonary function test performed on behalf of the employer supported the existence of occupational pneumoconiosis with no breathing impairment, or a 5% permanent partial disability award. Again, there is nothing in the record to suggest that this test was unreliable.

Applying the plain language of the *West Virginia Code* and *Javins* to the facts in this case, it is clear that on this evidence the appellant is entitled to a 15% permanent partial disability award. The testimony by the members of the Occupational Pneumoconiosis Board that the evidence supporting the 15% permanent partial disability award was less reliable than the employer's evidence is irrelevant. The Office of Judges and the Appeal Board are charged with operating independently from the Occupational Pneumoconiosis Board, and should have weighed the Board's testimony in its proper context. Because the evidence that the appellant has a 15% permanent partial disability as a result of exposure to occupational pneumoconiosis hazards was reliable, the Division's original award in favor of the appellant should have been affirmed.

### III.

We therefore reverse the May 29, 1998 decision of the Workers' Compensation Appeal Board, and remand the claim for entry of a 15% permanent partial disability award.

Reversed and Remanded.

Judge GARY JOHNSON, sitting by temporary assignment.

Justice McGRAW concurs.

Justice SCOTT did not participate in the decision of the Court.

STARCHER, Chief Justice, concurring:

(Filed March 1, 2000)

I am compelled to write a concurrence in this case by the simple, frustrating fact that, if the Workers' Compensation Division, the Office of Judges, and the Workers' Compensation Appeal Board would routinely follow the law, then this appeal would have been totally unnecessary.

The issue in this appeal was quite simple: a claimant received a permanent partial disability award from the Workers' Compensation Division based upon the claimant's reliable test evidence showing the claimant had a breathing impairment caused by occupational pneumoconiosis. The employer later introduced reliable test evidence showing the claimant had no breathing impairment. The "rule of liberality" in general, and West Virginia law and *Javins v. Workers' Compensation Comm'r*, 173 W.Va. 747, 320 S.E.2d 119 (1984) in particular, mandate that a claimant should receive the *highest* percentage of disability which can be determined by reliable test evidence; as per usual, the Office of Judges and the Appeal Board ignored the law and *Javins* and affirmed the entry of an order giving the claimant the *lowest* percentage of disability.

The "rule of liberality" applied by the majority opinion is not some wacky guideline dreamed up in the last few years by out-of-touch "liberals." It is a simple proposition, based in centuries of common law, and incorporated into the first workers' compensation systems created in Germany at the end of the 19th century and in England at the beginning of the 20th century. Before the Legislature even created our workers' compensation system, this Court set out the basis

248

for the rule of liberality in 1910, saying, "That which is plainly within the spirit, meaning and purpose of a remedial statute, though not therein expressed in terms, is as much a part of it as if it were so expressed." Syllabus Point 1, *Hasson v. City of Chester*, 67 W.Va. 278, 67 S.E. 731 (1910).

West Virginia created its statutory workers' compensation system through the adoption of a comprehensive, remedial statutory scheme in 1913, and as discussed in the majority opinion, the rule that evidence is to be liberally interpreted in favor of a claimant was statutorily embodied in *W.Va.Code*, 23–1–15 [1923].

From the beginning, the workers' compensation commissioner and the courts applied the workers' compensation statutes with the "spirit, meaning and purpose" of the Workers' Compensation Act in mind. The "spirit, meaning and purpose" of the Act was to assure every workers' compensation claimant that limited medical and wage benefits would be quickly paid whenever a claimant was injured in the course of and as a result of their employment, regardless of who was at fault for the injury. In return, the employer would be relieved of any common-law tort liability to the claimant. That was the "trade," the bargained-for tit-for-tat. The claimant gave up his lawsuit, and in return got a right to the speedy payment of medical benefits, speedy payment of a portion of his wages, and a speedy lump sum settlement if the injury was permanent.

Under the "rule of liberality," a claimant is supposed to be given the benefit of all reasonable inferences that can be drawn from the evidence in support of his or her claim. A claimant is not held to a high standard of proof; the claimant must only provide evidence sufficient to make a reasonable person conclude that an injury or disease exists and can be attributed to a workplace hazard. As we stated in *Eady v. State Compensation Comm'r*, 148 W.Va. 5, 11, 132 S.E.2d 642, 646 (1963):

the claimant in a workmen's compensation case is not required to establish his claim by clear and unequivocal proof but is only required, in satisfying the burden of proving his claim, to establish it by evidence

sufficient to make a reasonable person conclude that the claimant was injured while performing his duties in the course of his employment[.]

In response to the claimant's evidence, the employer bears the burden of showing. to some degree of certainty that the claimant does not have an injury or disease, or was not injured on the job. As we stated in Syllabus Point 2 of *Dunlap v. State Workmen's Compensation Comm'r*, 160 W.Va. 58, 232 S.E.2d 343 (1977):

If an injured employee provides some evidence to demonstrate that a particular injury did arise from the subject industrial accident, absent evidence which to some degree of certainty attributes the injury to a cause other than the subject accident, it will be presumed to have resulted from such accident.

The rule stated in *Dunlap* in interpreting the statute is not intended to eliminate the claimant's burden of proving that he or she sustained an injury or disease in the course of and as a result of their employment. The claimant must still show that his or her injury or disease is tied to a workplace accident or hazard. *W.Va.Code*, 23–1–15, as interpreted by this Court, merely provides "an inference that favors the injured employee and, in effect, it requires the employer to prove to some degree of certainty that the injury did not occur from the industrial accident, if the employer is to prevail on the point." *Dunlap*, 160 W.Va. at 64, 232 S.E.2d at 346.

In a lawsuit, a claimant must prove fault and injury by a preponderance of the evidence. In a workers' compensation claim, the claimant must only introduce enough evidence for a reasonable person to say the claimant has an injury, and that it occurred in the course of and as a result of the claimant's job. The employer bears the burden of proving with certainty that the injury did not occur, or that it did not occur in the course of and as a result of the claimant's job. If both sides introduce balanced evidence, in the theme of a "did so—did not" argument, then the rule of liberality tips the scale in favor of the claimant.

Between the claimant and the employer is the Workers' Compensation Division, which is supposed to act speedily in an administrative capacity, unbound by any notions of an adversarial system of proof. As we discussed in *Meadows v. Lewis,* 172 W.Va. 457, 469, 307 S.E.2d 625, 638 (1983):

> Under our statutes, the [workers' compensation] commissioner's role is that of a referee only when disputes arise between contestants. Otherwise, the commissioner serves in an administrative fact-finding capacity that is not bound by the traditional rules operative in an adversary system. The [Workers' Compensation] Act is designed to compensate injured workers as speedily and expeditiously as possible in order that injured workers and those who depend upon them for support shall not be left destitute during a period of disability. The benefits of this system accrue both to the employer, who is relieved from common-law tort liability for negligently inflicted injuries, and to the employee, who is assured prompt payment of benefits.

The reason the Division is supposed to act without any notions of an adversarial system of proof, and thereby construe evidence liberally in favor of the claimant, is to assure the claimant that benefits will be quickly paid. When the Division deviates from this role, and fails or refuses to examine evidence with the rule of liberality in mind, the claimant and the employer are denied the sole benefit of the workers' compensation system: a prompt, hassle-free resolution of the claim. Instead, every claim becomes a costly, miniature lawsuit, requiring the claimant and the employer to spend hundreds, if not thousands, of dollars on medical testing and expert testimony. Cases drag out for years—the instant case was filed in 1991, and 9 years later the claimant's award is still in litigation. Claimants and employers become embroiled in a costly, time-consuming, bureaucratic game of roulette, fraught with uncertainty, and the courts become clogged with appeals from litigants wanting to take one more turn at spinning the wheel.

If the Division, the Office of Judges, and the Workers' Compensation Appeal Board would steadfastly, consistently apply the rule of liberality, most of the litigation and appeals, and their concomitant costs, would vanish. For example, if the claimant's doctor produced a competent report saying the claimant had an injury with a 10% impairment, under the rule of liberality it would be pointless for the employer to spend thousands of dollars to repeat the test. If the employer's doctor reported a lower percentage of impairment, it would be disregarded; if the employer's doctor reported a higher percentage of impairment—well, such a report would probably never see the light of day. In the end, the Division would quickly pay the claimant benefits for a 10% permanent partial disability, and years of litigation over who has the "more reliable" test results would be avoided.

Every chamber of commerce in America has, at one time or another, gone in front of every state legislature and proclaimed that "the rule of liberality is killing business in this state," and has begged the legislature to abolish the principle. This argument ignores the fact that every workers' compensation system in every state uses the rule of liberality. It also ignores the fact that, in the absence of the rule of liberality, the workers' compensation system becomes an unreasonably restrictive alternative to the court system. West Virginia's *Constitution* guarantees its citizens access to the courts [1]—the workers' compensation system is constitutionally acceptable only because it is a speedier, more certain alternative to the court system due to the rule of liberality. If the rule of liberality is eliminated, citizens are deprived of access to a reasonable alternative to the courts—and therefore, the constitutionality of the workers' compensation system would be called into question.

I am in full agreement with the majority's application of *Javins* in this case, but I would have gone farther. In recent years, I have seen employer's attorneys contending that because the facts in *Javins* concerned the use of blood gas tests and breathing tests in

---

1. *West Virginia Constitution,* Art. III, section 17, states:

> The courts of this State shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay.

determining the degree of a claimant's impairment, that the liberality rule applied in *Javins* should apply only to cases involving those tests and no other. This is a ridiculous argument. The rule of liberality applies to all aspects of an occupational pneumoconiosis claim, including the determination of whether or not a claimant has pneumoconiosis, whether a claimant has any respiratory impairment, and whether the pneumoconiosis or respiratory impairment is linked to some occupational hazard.

Time and again this Court is asked to review cases where the Office of Judges and the Appeal Board have failed to apply the rule of liberality to disputes over x-ray evidence of the existence of pneumoconiosis, or failed apply the rule to disputes over whether a breathing impairment such as asthma is linked to exposure to dusts, chemicals or fumes in the workplace. While I think these disputes are covered by *Javins*, I would dispense with this problem by adopting the following syllabus point:

> If the parties to a workers' compensation claim introduce reliable, conflicting evidence about the existence of occupational pneumoconiosis, or reliable, conflicting evidence about the existence or degree of respiratory impairment caused by or attributable to exposure to dust or other hazardous materials in the course of the employment, then the Workers' Compensation Division, the Workers' Compensation Office of Judges and the Workers' Compensation Appeal Board must award the claimant benefits based upon the reliable evidence that shows either the existence of occupational pneumoconiosis or the highest degree of respiratory impairment. The claimant must be given the benefit of all reasonable inferences the record will allow, and any conflicts in evidence must be resolved in favor of the claimant.

One other issue not discussed by the majority opinion merits attention. We explicitly held in *Javins* and *Persiani v. SWCC*, 162 W.Va. 230, 248 S.E.2d 844 (1978) that the Division, Office of Judges or Appeal Board may only disregard evidence that is "unreliable." Whether evidence is unreliable is a legal determination to be made by the finder of fact, *i.e.*, the Division or Office of Judges, and *not* the Occupational Pneumoconiosis Board. The Occupational Pneumoconiosis Board was merely created as a panel of experts to provide advice to the Workers' Compensation Commissioner on questions arising in occupational pneumoconiosis cases. *See W.Va.Code*, 23–4–8a [1974]. The Board was not created as the final arbiter of the claimant's medical condition, nor the final authority on whether the claimant's, the employer's or the Board's evidence is reliable or probative. To hold otherwise would make the Board the judge, jury and sole witness in every proceeding, thereby throwing constitutional due process protections to the wind. In sum, whether the evidence of a party is unreliable is a determination that must be made by an affirmative showing by the parties in the record, and such an affirmative showing can include the opinions of the members of the Occupational Pneumoconiosis Board.

Additionally, the finder of fact may not rely upon "only probable or conjectural reasons or causes" as a basis for disregarding evidence. *Pripich v. State Compensation Comm'r*, 112 W.Va. at 543, 166 S.E. at 5 (1932). In other words, the party attempting to challenge the suspect evidence must introduce some specific, credible proof that a particular test result is unreliable. The unsubstantiated opinion of an expert, including the members of the Occupational Pneumoconiosis Board, that a particular piece of evidence is "unreliable" is itself unacceptable. The expert opinion must be accompanied by specific, credible evidence or testimony that the suspect test result is unreliable. And, of course, the opposing party must be given an opportunity to develop their own evidence to refute that expert's opinion regarding unreliability, because "according peculiar weight to a particular expert without prior notice or formal rules in that regard [is] clearly wrong." *Persiani*, 248 S.E.2d at 849.

Lastly, the *Code of State Regulations* establishes eight specific circumstances where a pulmonary function test must be deemed unreliable.

> The effort shall be judged unacceptable and cannot be considered in evaluating pulmonary functional impairment when the subject:
>
> (1) Has not reached full inspiration preceding the forced expiration; or

(2) Has not used maximal effort during the entire forced expiration; or

(3) Has not continued the expiration for at least five (5) seconds or until an obvious plateau in the volume-time curve has occurred; or

(4) Has an obstructed mouthpiece or a leak around the mouthpiece (obstruction due to tongue being placed in front of mouthpiece, false teeth falling in front of mouthpiece, etc.); or

(5) Has coughed or closed his glottis; or

(6) Has an unsatisfactory start of expiration, one characterized by excessive hesitation (or false starts), and therefore did not allow back extrapolation of time zero (0) (extrapolated volume on the volume-time tracing must be less than ten percent (10%) of the FVC); or

(7) Has an excessive variability between the three (3) satisfactory curves. The variation between the two (2) largest $FEV_1$'s of the three (3) satisfactory tracings should not exceed seven percent (7%) of the largest $FEV_1$ or one hundred (100) ml, whichever is greater.

(8) Predicted values are derived from Kory's Nomogram.

85 *Code of State Regulations* 1, § 20.8.5(b). The first seven paragraphs of the regulation are fairly clear. However, the last paragraph of the regulation is unclear, and refers to "Kory's Nomogram," a table of predicted breathing volumes for "average" individuals against which a claimant's breathing test results would be measured. *See* Ross C. Kory, *et al.,* "The Veterans Administration—Army Cooperative Study of Pulmonary Function," 30 *Am. Jour. of Medicine* 243 (1961). For reasons not apparent from the regulation, it appears that any pulmonary function test of a claimant that is measured against the predicted function capacity established by the Kory study is inherently unreliable.

While the language of the last paragraph in the regulation is clumsily phrased, read in context the regulation means that a pulmonary function test result "shall be judged unacceptable and cannot be considered in evaluating pulmonary functional impairment when ... [the] predicted values are derived from Kory's Nomogram." I cannot determine from the record in this case the statistical source of the predicted breathing volumes

that were used to determine the degree of the appellant's breathing impairment. But if the source was the Kory study, then those test results would be automatically unreliable and void under the Division's regulations.

In the instant case, the Occupational Pneumoconiosis Board did not make reference to any of the eight factors listed in 85 *Code of State Regulations* 1, 20.8.5(b). Instead, the Board dismissed the claimant's medical evidence because the employer's evidence was "more reliable." While a panel of doctors might objectively find a piece of evidence "more reliable," the test under the rule of liberality is "what evidence is reliable *and* most favorable to the claimant." The claimant is presumed to have one shot at getting any benefits for a permanent disability—if the panel of doctors guesses wrong, or the "more reliable" evidence is somehow inherently, unnoticeably flawed, then the claimant has lost his one shot at being compensated for his work-related injury.

I therefore concur with the majority's opinion awarding benefits to the claimant.